**E-FILED**
Tuesday, 19 July, 2016  02:18:23 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JILL J. SHORT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14-cv-3009 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of | ) | |
| Social Security | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE

Plaintiff Jill J. Short appeals from the denial of her application for Social Security Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income Disability Benefits (SSI) under Title XVI of the Social Security Act.  42 U.S.C. §§ 416(i), 423, 1381a, and 1382c (collectively Disability Benefits).  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Short has filed a corrected Motion for Summary Judgment (d/e 20), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e 24).  This matter is before this Court for a Report and Recommendation.  For the reasons set forth below, this Court recommends that the decision of the Commissioner should be AFFIRMED.

## STATEMENT OF FACTS

The Plaintiff Short was born on September 13, 1951.  She graduated from high school and obtained a certified nursing assistant (CNA) certificate.  She previously worked as a CNA at a hospital and worked as an in-home care giver for the elderly, most recently her mother-in-law. Answer to Complaint (d/e 8), attached Certified Transcript of Proceedings before the Social Security Administration (R.) 40, 48-49, 182, 206, 228. Short last worked in substantial gainful activity on March 31, 2008.  Short suffers from degenerative changes in the lumbar spine, fibromyalgia, diabetes mellitus, chronic obstructive pulmonary disease (COPD), impingement of the left shoulder, and depression.  R. 20.  Short filed applications for Disability Benefits on May 15, 2009, September 1, 2009, October 9, 2010, and October 18, 2010.  R. 145-168.  Short initially alleged that she became disabled on November 13, 2005, and subsequently amended the onset date to December 31, 2007.  R. 17.

In June 2005, Dr. George R. Magre, M.D., ordered x-rays and an MRI of Short's lumbar spine due to complaints of lower back pain.  The x-ray showed L2-3 degenerative disc disease, mild lumbar spondylosis, and mild lumbar scoliosis.  R. 282.  The MRI showed multilevel disc desiccation, disc

degeneration with mild disc protrusions, and neural foraminal stenosis on the left at L5-S1.  R. 284.

On March 3, 2006, Short was evaluated for physical therapy for back pain.  R. 293-96.  Short reported "knife stretch-like" pain which was relieved by Skelaxin and Darvocet.  The medication, however, left her groggy.  The physical therapist assessed Short with lumbar pain with decreased core stability; however, Short's symptoms were mechanically inconclusive.  The therapist rated Short's rehabilitation potential to be fair to good.  R. 295-96.

On September 11, 2006, Short saw Dr. Richard Del Valle, M.D., complaining of depression.  Short reported that the depression came on over the previous three months.  Short reported that she went to the emergency room on the preceding Saturday.  She reported having some suicidal ideations, but did not intend to act on them.  Dr. Del Valle assessed acute depression.  He increased her dosage of Effexor, and he recommended that she seek counseling.  Short had been taking Effexor for hot flashes.  R. 396.

On February 12, 2007, Short saw Sandra Brummet, Nurse Practitioner with Dr. Del Valle, complaining of left flank discomfort. R. 390.[1] Short reported she lifted heavy patients at work and woke up with the pain

---

[1] See R. 353 for "N.P." notation on Brummet's electronic signature, indicating her credentials.

the next day.  On examination, Brummet found no edema.  Straight leg testing was negative.  Short could move in all four directions and could twist without too much discomfort, although Short did so cautiously.  Brummet assessed a pulled muscle.  Brummet administered injections for pain and prescribed ibuprofen and Skelaxin.  R. 391.

On April 24, 2007, Short underwent x-rays of her lumbar spine.  The x-rays showed degenerative arthritic changes, but with no significant changes from previous examination on June 17, 2005.  R. 437.

On May 21, 2007, Short saw Dr. Gary Western, M.D., for back pain.  Short reported no numbness or tingling; she felt better when standing; and she felt discomfort after sitting for an extended period of time.  On examination, Dr. Western found that Short was tender at her left sacroiliac joint which was aggravated with extension and side bending.  Straight leg testing was negative.  Short's sensation was intact, her strength was normal, and her ability to move the joints in her lower extremities was normal.  Dr. Western recommended an epidural injection in Short's sacroiliac joint, to be administered later that day.  R. 385.

On August 1, 2007, Short saw Deanna Vota, medical healthcare provider associated with Dr. Del Valle.[2]  Short reported that she was "doing a lot better today."  Short reported that the injection she received from Dr. Western helped quite a bit for about six weeks. Short reported that her back was again bothering her with almost any activity.  Short reported that the pain radiated down into her leg.  On examination, Short had some tenderness over her sacroiliac joint.  Vota recommended an MRI of Short's back.  R. 380-81.

On August 15, 2007, Short underwent an MRI of her lumbar spine. The MRI showed mild disc herniation at L1-2 andL3--4, foraminal narrowing at L5-S1, and left-sided neural foraminal encroachment at L4-5 due to significant osteoarthritic changes of the facet.  R. 314.

On January 28, 2008, Short saw Dr. Del Valle for back pain.  Short reported pain on her left side extending to some degree into her left leg. The pain was not as bad as before.  Short reported that she could not do much because of the pain.  Short was still smoking against Dr. Del Valle's advice.  On examination, Short had pain in her left sacroiliac joint and lower lumbar region.  Straight leg testing was positive on the left side.  Dr. Del Valle assessed osteoarthritis and lumbar disc degeneration.  Dr. Del Valle

---

[2] The record does not indicate Vota's credentials or qualifications as a health care provider.  Vota had authority to prescribe medication.

renewed Short's prescription for Effexor, discontinued the Nabumenton and Skelaxin, and prescribed acetaminophen-codeine #3 tablets.  Dr. Del Valle noted that surgeon, Dr. Payne, recommended against surgery.  Dr. Del Valle recommended getting a second surgical opinion.  R. 369.

On February 3, 2009, Short saw Rebecca Sharp, medical healthcare provider associated with Dr. Del Valle, for a routine six-month visit. [3]  Short reported that she was feeling okay.  She reported some bad dreams in the last few weeks. Sharp stated that Short was doing well with the Effexor for her depression.  Sharp instructed Short to call back if the dreams persisted. R. 357.

On June 9, 2009, Short saw medical provider Sharp.  Short reported loose stools and chronic low grade fever for three weeks.  Short reported that she was still smoking.  Short reported cough and sinus drainage, aching muscles, fatigue, and feeling more depressed.  Short reported that she was sleeping fourteen hours a day and not doing any outside walking. Sharp's examination of Short was unremarkable, except for weak pulses in her feet.  R. 354-55.

Sharp assessed cough, diarrhea, type II diabetes mellitus, and depression.  Sharp increased Short's dosage of generic Effexor.  Sharp

---

[3] The record does not indicate Sharp's credentials or qualifications as a health care provider.  Sharp had authority to prescribe medication.

also recommended sleeping less than eight hours a day and going outside for walks.  R. 355.

On August 28, 2009, Short saw Nurse Practitioner Brummet complaining of aches all over.  Short reported that ibuprofen did not help with the aches and pains.  Short reported that she stopped taking Effexor because "it made her feel like a zombie all the time."  On examination Brummet found "a lot of the point tenderness when checking for fibromyalgia symptoms."  Brummet assessed myalgia and myositis. Brummet prescribed Tramadol for the discomfort and discussed taking either Lyrica or Cymbalta.  R. 352-53.

On September 16, 2009, Short saw Dr. Del Valle.  Short reported that she was "feeling a lot better."  Short reported that the Cymbalta Nurse Practitioner Brummet gave her "really helped."  Short reported that problems with loose stools resolved.  Short was still smoking.  Short reported that she was not having much back pain, but was "doing little in the way of moving about or aerobic exercises."  Dr. Del Valle noted that Short's active problems included anxiety disorder, depression, and myalgia and myositis.  R. 350.

On examination, Dr. Del Valle noted that she had no edema and was able to get on the exam table without difficulty.  Dr. Del Valle assessed

hyperlipidemia, type II diabetes mellitus, fibromyalgia, and nicotine

dependence.  Dr. Del Valle continued the Cymbalta prescription for

fibromyalgia.  Dr. Del Valle did not prescribe any treatment for depression

or anxiety.  R. 351.

On or about October 5, 2009, Social Security Administration

interviewer conducted a telephone interview of Short and completed a

Work Activity Report (Self-Employed Person) form.  Short reported to the

interviewer that she worked twenty-four hours a week from April 3, 2008, to

June 17, 2009, taking care of her mother-in-law.  Short reported that she

cooked for her mother-in-law, bathed her mother-in-law, gave her mother-

in-law her medications, took her mother-in-law to the doctor, and helped

with things around her mother-in-law's home, including washing dishes.

R. 191.[4]

On November 11, 2009, Short saw state agency physician Dr. Vittal

Chapa, M.D., for a consultative examination.  R. 277- 81.  Short reported

that she had a bad back and fibromyalgia.  Short reported pain in her arms,

legs, back, and neck.  She reported taking Tylenol No.3 daily.  She rated

her pain as a 9 on a scale of 1 to 10.  Short denied having pain in her lower

---

[4] The attestation of a T. Bartlett is dated October 5, 2009.  R. 193.  The signature of the interviewer J. Matt is dated September 18, 2009.  An unsigned, typed version of this form dated October 18, 2010, appears in the record. R. 206-98.

extremities.  She reported difficulty standing and sitting or long periods of time.  Short reported difficulty bending and stooping.  R. 277.  Short's medication list included Cymbalta and Tramadol.  R. 280.

On examination, Short could ambulate without aids, and her gait was normal.  Short had no edema.  Short showed no motor weakness or muscle atrophy.  Short appreciated pinprick sensations.  Short showed no evidence of joint redness, heat, swelling or thickening.  Short showed no evidence of paravertebral muscle spasm.  Short's hand grip was normal.  Short could perform fine and gross motor skills.  Short's straight leg testing was negative bilaterally.  Short had full range of motion in her joints, except that her lumbosacral spine flexion was limited.  Short had no difficulty getting on and off the examination table.  Dr. Chapa noted a history of fibromyalgia.  Dr. Chapa assessed fibromyalgia and chronic lumbosacral pain syndrome.  R. 279.

On September 15, 2010, Short saw Dr. Del Valle.  Short reported that she was "doing okay overall."  Short was still smoking.  Short reported that "Otherwise, she is not getting along too bad.  Sometimes she has a few aches and pains and she is not able to do a whole lot because her back will flareup (sic)."  R. 528.  Dr. Del Valle's examination showed unremarkable results.  Dr. Del Valle noted that Short's active problems included

fibromyalgia, depression, and anxiety.  Dr. Del Valle assessed hypertension, hyperlipidemia, type II diabetes mellitus, and nicotine dependence.  Dr. Del Valle's treatment plan focused on stopping smoking.  Dr. Del Valle warned Short strenuously about the risks of continuing to smoke.  R. 529.

On October 25, 2010, Dr. Del Valle wrote a one-sentence statement, which said, "Jill Short is unable to hold employment due to her physical conditions:  fibromyalgia and arthritic back and as a result of applying for disability."  R. 443.

On November 13, 2010, Short completed a Function Report—Adult form.  R. 234-41.  Short reported that she was limited in her ability to work because of back pain and fibromyalgia.  Short reported that she could no longer, "work, walk down halls, do my job."  Short reported that in a typical day she drank coffee, did dishes and laundry, and otherwise sat or lay down.  She also fed her dogs and let them outside.  R. 234.

Short reported that she cooked one meal a day.  Short reported that her impairments did not affect how she cooked meals.  Short reported that she did laundry and housecleaning once a week.  She reported that her husband did the yard work because "mowing hurts too much."  Short reported that she drove a car by herself.  She reported that she did the

grocery shopping.  She reported that grocery shopping took an hour.  Short reported that she watched television, watched sports, and crocheted daily. Short reported no changes in these activities since her impairments began. R. 235-38.

Short reported that she talked to other people daily.   Short reported that she went places and took part in social activities a "little."  Short reported that she did not have any problems getting along with friends and family.  Short reported that she had no changes in her social activities since her impairments began.  R. 238-39.

Short reported that she could walk three blocks before needing to rest for fifteen minutes; she could finish what she started; she could follow written and spoken instructions; she got along with authority figures "fine;" and she did not handle stress or changes in routine very well.  Short also reported that her impairments affected her ability to lift, squat, and stand, but did not give any details.  R. 239-40.

On the same day, November 13, 2010, Short's husband Floyd Short completed a Function Report—Adult—Third Party form.  R. 220-27.  Floyd Short lived with his wife.  Floyd Short stated that his wife's abilities were very limited.  He reported that she had good days and bad days.  He reported that on her bad days, she was in constant pain and had to lie

down and stay in bed for the day.  Floyd Short reported that Short had more bad days than good.  R. 220, 227.

Floyd Short stated that Short occasionally took care of her grandchildren.  Short also fed and watered their dogs, and let them in and out of their home.  Floyd Short reported that Short's impairments did not affect her sleep.  Floyd Short reported that Short could feed, dress, bathe, take care of her personal hygiene, and groom herself.  R. 221.

Floyd Short reported that Short cooked meals once a week, but went to bed when she was finished because of the pain.  Floyd Short reported that Short did the laundry and loaded and unloaded the dishwasher.  Floyd reported that Short took a long time to perform these tasks because she worked in short spurts.  Floyd Short stated that sometimes he finished the work because she was in too much pain.  R. 222.

Floyd Short reported that Short went outside the home three to four times a week.  Short drove and rode in a car at these times.  Floyd Short reported that he did most of the shopping because Short could not walk too long.  Floyd Short reported that Short watched television and read during the day.  R. 223-24

Floyd Short reported that friends came to see his wife at their home. He also reported that his wife came to his workplace to see people there.

Floyd Short reported that his wife talked on the phone daily.  Floyd Short reported that she came to his workplace four to five times a week. R. 224.

Floyd Short opined that his wife could lift twenty pounds and walk two or three blocks before resting for five minutes.  Floyd Short reported that his wife could do a little squatting, bending, reaching, walking, sitting, kneeling, or stair climbing.  Floyd Short stated that she was limited in performing these tasks because of her pain.  Floyd Short reported that Short had no problem paying attention, and was "OK" following written and spoken instructions, getting along with authority figures, and handling changes in routine.  Floyd Short reported that his wife did not handle stress "real well."  R. 225-26.

On December 27, 2010, Short saw Dr. Chapa for a second consultative examination.  R. 444-48.  Short reported that she had back pain.  She reported taking Tramadol.  Short reported that she could not stand for long periods of time, she took breaks when she cleaned the house.  Short reported that she had fibromyalgia.  Short reported that her pain moves around in her body, in her arms and legs, and sometimes in her neck.  She denied any other physical symptoms.  R. 444.

On examination, Short was able to ambulate without any aids, and her gait was normal.  Short had no edema.  She had no signs of motor weakness or muscle atrophy.  Short could appreciate pinprick sensation in both upper and lower extremities.  Short had no signs of joint redness, heat, swelling or thickening.  Short had no signs of paravertebral muscle spasm.  Short had normal grip strength, and she could perform gross and fine manipulations.  Straight leg testing was negative.  Short had normal lumbar spine flexion, and she had full range of motion in her joints.  Short had no trouble getting on and off the examination table.  R. 445-47.  Dr. Chapa listed his diagnostic impression as fibromyalgia and chronic lumbosacral pain syndrome.  R. 446.

On January 6, 2011, Short saw state agency psychologist Dolores Trello, Psy.D., for a mental status examination.  R. 449-53.  On examination, Short was fully oriented, calm and cooperative.  Dr. Trello stated that Short had a normal affect.  Short's immediate, short-term, and remote memory seemed to be intact.  R. 451.  Short reported having trouble sleeping, mood swings and irritability.  She also reported worrying about paying bills since she has not been working.  R. 450.  Dr. Trello assessed depressed mood associated with medical condition and dysthymic disorder.  Dr. Trello assigned a Global Assessment of

Functioning (GAF) score of 50, and stated "Serious Impairment in Vocational Functioning."  R. 452.[5]  Dr. Trello also stated that Short "also suffers fibro fog and chronic pain associated with fibromyalgia.  Her depressed mood does seem to be associated with her medical conditions." R. 453.

On January 18, 2011, state agency psychologist Lionel Hudspeth, Psy.D., prepared a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment.  R. 454-69.  Dr. Hudspeth opined that Short suffered from dysthymia and depressed mood secondary to her medical conditions.  R. 457.   Dr. Hudspeth opined that Short had moderate difficulties in maintaining concentration, persistence, or pace.  Dr. Hudspeth opined that Short has not had any episodes of decompensation of an extended duration.  R. 464.

Dr. Hudspeth opined that Short's mental impairments would moderately limit her ability to maintain attention and concentration for extended periods of time and would moderately limit her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.  R. 467.  Dr. Hudspeth further opined that

---

[5] The GAF score was a measure of a clinician's judgment of an individual's overall level of functioning on a hypothetical continuum of mental health and illness.  American Psychiatric Assn, Diagnostic and Statistical Manual of Mental Disorders (4th ed. Text Rev.) at 32-35.  The American Psychiatric Association no longer recommends use of the GAF score.  Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013), at 16.

Short would be moderately limited in her ability to accept instructions and respond appropriately to criticism from superiors.  R. 468.  Dr. Hudspeth opined that Short had no other functional limitations due to her mental impairments.  R. 464, 467-69.

On January 19, 2011, state agency physician Dr. Richard Bilinsky, M.D., prepared a Physical Residual Functional Capacity Assessment.  R. 477.  Dr. Bilinsky opined that Short could occasionally lift fifty pounds and frequently lift twenty-five pounds; and could sit for about six hours in an eight-hour workday.  Dr. Bilinsky opined that Short had no other functional limitations from her physical condition.  R. 472-77.

On March 14, 2011, Dr. Del Valle prepared a Medical Source Statement.  R. 545-49.  Dr. Del Valle opined that Short had the following objective signs of functional impairment:  reduced range of motion in her lumbar spine, impaired sleep, abnormal posture, tenderness, trigger points, abnormal gait, and a positive straight leg raising test.  R. 545.

Dr. Del Valle opined that Short was moderately limited in her ability to deal with work stress.  Dr. Del Valle opined that Short could sit continuously for fifteen minutes; sit for a total of four hours in an eight-hour workday; stand or walk continuously for two hours in an eight-hour workday; and stand or walk for a total of three hours in an eight-hour workday.  Dr. Del

Valle opined that Short would need an additional hour of rest during an eight-hour work day beyond standard breaks and meal period.  R. 547-48. Dr. Del Valle opined that Short would be absent more than three times a month due to her physical limitations, including treatment.  R. 549.

Dr. Del Valle opined that Short could occasionally lift up to ten pounds, but never lift heavier weights; could never stoop; could never bend her head forward fifteen degrees or backwards five degrees; could occasionally rotate her head left or right thirty degrees; and could occasionally reach and manipulate objects with her hands.  R. 548.

On March 16, 2011, Dr. Del Valle prepared a Medical Source Statement of Ability to do Work-Related Activities (Mental).  R. 551-53.  Dr. Del Valle opined that Short was slightly limited in her ability to understand and remember detailed instructions, carry out detailed instructions, and make judgments on simple work-related decisions.  R. 551.  Dr. Del Valle opined that Short was moderately limited in her ability to interact with the public, supervisors, and co-workers, and had marked limitations in her ability to respond appropriately to work pressures and changes in routine. Dr. Del Valle opined that Short had moderate limitations in her ability to maintain social functioning and frequent deficiencies of concentration, persistence or pace.  Dr. Del Valle further opined that Short has had

repeated episodes of deterioration or decompensation in work settings which caused her to withdraw and to experience exacerbation of signs and symptoms of her impairments.  R. 552.

On June 15, 2011, Short saw Nurse Practitioner Brummet with pain in her left upper arm.  Short reported that the pain had persisted for four or five weeks.  Short reported some problems stretching out her left arm.  Short reported that ibuprofen provided no relief.  Short did not have any radiating pain, numbness or tingling.  On examination, Short's left shoulder was tender with movement, and she had discomfort resisting against pressure from Brummet.  Brummet assessed shoulder pain.  Brummet stated that Short might have an impingement.  Brummet prescribed prednisone.  Brummet also prescribed a sling at Short's request.  Brummet also recommended icing the shoulder.   R. 495-96.

On September 20, 2011, Short saw Arlene Froelich, a medical healthcare provider associated with Dr. Del Valle.[6]  Short reported left shoulder pain when she tried to raise her arm.  On examination, Short had pain on abduction against resistance as well as crepitus.  Froelich administered a steroid injection into Short's left shoulder. Short reported good post-injection relief. R. 520-21.

---

[6] The record does not indicate Froelich's credentials or qualifications as a health care provider.  Froelich had authority to prescribe medication.

On May 3, 2012, vocational expert Dennis Gustafson issued a Past Relevant Work Summary for Short.  Gustafson opined that Short's past relevant work as a CNA in a hospital fit the Department of Labor's Dictionary of Occupational Title's (DOT) work title of Nurse Assistant, DOT Code No. 355.674.014.  Gustafson stated that the Nurse Assistant job was semiskilled and at the medium exertional level.  Gustafson opined that Short's past relevant work as a care giver fit the DOT work title of Companion, DOT Code No. 309.677.010.  Gustafson opined that the Companion job was semiskilled and at the light exertional level.  R. 271.

<u>THE ADMINISTRATIVE HEARING</u>

On May 3, 2012, the Administrative Law Judge (ALJ) held an evidentiary hearing.  The ALJ held the hearing in Peoria, Illinois.  Short appeared with her attorney by videoconference.  Vocational expert Gustafson appeared in person in Peoria.  R. 38-39.  Short's attorney announced at the beginning of the hearing that Short has amended her alleged onset date to December 31, 2007.  R. 40.

Short then testified.  She said she experienced sharp back pain in December 2007 that radiated into her left leg.  She continued working as a care giver for her mother-in-law until April 2008.  She stated she got fired because she kept missing work.  R. 40.   Short testified that she worked six

hours a day, five days a week from December 2007 to April 2008.  She was paid $10 an hour and earned about $300 a week.  R. 41.  She was absent from work two days a week when she was fired.

Short indicated that her work for her mother-in-law consisted of dressing her, helping her in the bathroom, and getting her meals.  Her mother-in-law resided in a place that provided the meals, but Short brought the tray to her mother-in-law.  R. 42.  The ALJ noted that Short made $5,563 in 2008 through her care giver work.  R. 43.

Short lived in a single story home with a small loft upstairs and a partial unfinished basement.  The laundry facilities were on the ground floor.  Short lived with her husband Floyd, her daughter, and two grandsons.  The grandsons were 12 and 14 at the time of the hearing. R. 44-45.

Short received a $15,000 worker's compensation settlement in 2008. She did not receive any worker's compensation payments currently.  She received food stamps and assistance with utilities. R. 46-47.

Short was an in-home care giver from 1993 to 1999.   She dressed her clients, cooked meals, helped them in the bathroom, and drove them on shopping trips.  She did not lift her clients.  The heaviest things she lifted

were groceries.  She estimated that the bags of groceries weighed ten pounds. R. 49-50.

Short then went to work as a CNA is a hospital.  She lifted patients as part of this job.  R. 50.

Short stated that she suffered from back pain.  She took ibuprofen and Tylenol #3 with codeine to relieve the pain.  Short testified that the medication helped with her pain "most of the time".  "But I'm in pain quite a bit; that and my fibromyalgia."  Short indicated that she "lay down a lot" in bed to deal with the pain.  For the previous two years, she spent eight hours in bed during a typical day because of the pain.  R. 51.  Short testified that she also sometimes took a bath to relieve the pain.  R. 52.

Short related that the epidural shots she received temporarily helped reduce her back pain for about a year.  The shots reduced the pain, but did not relieve the pain completely.  Short said that her doctors did not plan any further treatment to help her with her back pain.  R. 52.

Short reported that she had fibromyalgia pain in her upper body. She took Cymbalta, ibuprofen, and sometimes Aleve for her fibromyalgia. R. 56.

Short testified that she could stand or walk for about thirty minutes at one time, and sit for thirty minutes at one time, but had to lie down at some

point during the day.  Short said that she could lift about ten pounds, but anything more would hurt her back.  Her lower back hurt when she reached overhead.  Short had pain in her left arm if she reached forward.  Short testified that she could not lift a coffee pot with her left arm because of a shoulder impingement.  Short indicated that she was right-handed.  She could lift a gallon of milk with her right hand, but not with her left.  Short testified that she had no trouble using her hands.  R. 54.

Short stated that she could take care of herself, but "it takes me a while."  Short did not cook because her back hurt if she stood too long.  Short did not do the dishes.  Her daughter took care of the dishes.  Short testified that she could not bend over to load and unload the dishwasher.  R. 58.  She testified that she did not vacuum or sweep.  Her husband and daughter took care of those tasks.  R. 63-64.

Short's husband did the grocery shopping.  She testified that she went with her husband shopping "maybe a couple times a month."  She had to hang onto the grocery cart when she went.  She testified that she only spent about fifteen minutes in the store.  Short testified that her husband and her daughter did the laundry.  Short said that she had been unable to do the laundry "[f]or a couple of years."  R. 58.

Short did not attend church and did not belong to any social organizations.  R. 58.  She did not go to the library or do any volunteer work.  R. 65.  She testified that she visited at her son's house about four times a month.  He lived "a couple of miles" away from her in the same town.  R. 58.  Short stated that her son also came to visit her.  She testified, "They, they come over a lot."  Her friends also visited her at her home.  She and her friends watched sports on television.  She used to play cards with her friends, but stopped because she could not sit up for long periods of time.  R. 64.  Short, testified, however, that she played Uno or Skip Bo card games with her grandsons sometimes.  R. 65.

Short related that she and her husband had a computer, but she only used it to check the weather and occasionally play a game.  She testified that she used the computer a total of an hour a week.  R. 61-62.

Short crocheted as a hobby.  She went to her grandson's baseball games once in a while.  She indicated that her husband and one of her grandsons was each in a band.  She testified she had not gone to their concerts recently, except she went with her husband on New Year's Eve.  R. 63, 64-65.  Short said she was still smoking cigarettes.  She stopped for three years, but started again.  R. 66.

Short testified that she also had depression.  She related that Cymbalta helped.  Short said her inability to work stemmed mostly from her physical problems rather than her depression.  She testified that she would be able to work but for her physical problems.  R. 59-60.

Short said that she got short of breath if she walked too long due to her COPD.  She was also sensitive to dust, fumes, temperature extremes, and humidity.  R. 67.

Vocational expert Gustafson then testified.  The ALJ asked Gustafson a series of hypothetical questions.  Initially, the ALJ asked Gustafson to assume Short could perform medium exertional work.  The ALJ stated,

> Would you also please assume that given symptoms of depression there would be some ruminations, some sadness and, and that might interfere with sufficient concentration and focus to perform skilled work to more complex types of activities involved in skilled work.  So we would limit Ms. Short to only semi-skilled work.  With these limits would she be able to perform past work?

R. 66.  Gustafson opined that she could perform her past relevant work. R. 67.  The ALJ asked Gustafson, "[I]f I reduce to light [exertional work] with the same limits, she could do past work?"  R. 67.  Gustafson opined, "The companion related more."  R. 67.

The ALJ asked Gustafson to assume occasional overhead reaching and avoiding concentrated exposure to extreme heat and humidity.

Gustafson opined that Short could still perform her prior work as a

companion.  R. 68.  Gustafson opined that she could not work if she

missed two days or more a month.  She could also not work if she would be

off task twenty percent of the time or more.  She also could not work if she

needed additional breaks during the day.  R. 68-69.

The ALJ and Short's attorney agreed that she would be disabled if

she were limited to sedentary work due to her age and lack of transferable

skills.  R. 68.

Gustafson testified that his opinions were consistent with the DOT.

The ALJ asked Gustafson the basis for opinions that covered matters not

addressed in the DOT.  Gustafson testified that he based those opinions on

his professional experience.  R. 69.

## THE DECISION OF THE ALJ

On July 16, 2012, the ALJ issued her opinion.  R. 17-30.  The ALJ

followed the five-step analysis set forth in Social Security Administration

Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires

that the claimant not be currently engaged in substantial gainful activity.

20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant

to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If

true, Step 3 requires a determination of whether the claimant is so severely

impaired that she is disabled regardless of her age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work considering her age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th

Cir. 2011); <u>Briscoe ex rel. Taylor v. Bar</u>nhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found at Step 1 that Short ceased engaging in substantial gainful activity on March 31, 2008.  The ALJ found that Short's work as a companion for her mother-in-law until April 2008 was substantial gainful activity.  The ALJ found that Short met the requirements of Step 1 after March 31, 2008.  R. 19-20.

At Step 2, the ALJ found that Short suffered from the following severe impairments:  degenerative changes in the lumbar spine, fibromyalgia, diabetes mellitus, COPD, slight impingement of the left shoulder, and depression.  R. 20.

The ALJ found at Step 3 that Short's impairments or combination of impairments did not meet or medically equal any Listing.  The ALJ considered Listing 1.02B, major dysfunctions of a joint; Listing 1.04, for disorders of the spine; Listing 11.14, for peripheral neuropathies, a complication of diabetes; Listing 3.02A for COPD; and Listing 12.04 for affective diseases, such as depression.  The ALJ also determined Short's medical records did not indicate that Short's impairments due to fibromyalgia were medically equal to any Listing.  R. 20-22.

At Step 4, the ALJ found that Short had the RFC to perform light work except that she:  could only occasionally reach overhead; was required to avoid concentrated exposure to extreme heat and humidity; was limited to no more than semiskilled work.  R. 22.  The ALJ based her RFC determination on:  Dr. Bilinsky's opinions; Dr. Hudspeth's opinions; Dr. Chapa's consultative examinations; medical records that showed that Cymbalta was effective in treating Short's depression and fibromyalgia; medical records that showed that Short's spinal condition was stable from July 2008 to March 2011; and Short's testimony regarding her social activity with family and friends.  R. 22-26.  The ALJ limited Short to semiskilled work because she found that her depression "symptoms and ruminations would preclude the ability to sustain complex tasks required by skilled work over a full 8-hour period."  R. 29.

In reaching this conclusion, the ALJ found that Short's testimony that she was more severely functionally impaired was not fully credible when compared to the objective medical evidence and the other evidence in the record.  The ALJ found that her testimony was inconsistent with the findings in her medical records and was inconsistent with her November 13, 2010 Adult Functions Report (Function Report).  R. 28-29.The ALJ also found that her husband's November 13, 2010 Adult Function Report—Third

Party (Third Party Report) was not fully credible to the extent that it contradicted the Function Report and when compared to the objective medical evidence and the other evidence in the record.  R. 29.

The ALJ also rejected Dr. Trello's opinion that Short had a GAF score of 50 and serious limitations of function.  The ALJ found that no objective medical evidence supported this finding.  The ALJ found that Dr. Trello's finding was also inconsistent with the evidence that Short performed some chores around the house, occasionally went grocery shopping, enjoyed crocheting, played cards with her grandsons, and regularly interacted socially with her family and friends.  R. 24.

The ALJ gave little weight to Dr. Del Valle's opinions.  The ALJ found that Dr. Del Valle's October 25, 2010, note was entitled to no weight because the note contained only a legal conclusion that Short was disabled, rather than medical opinions.  R. 27.  The ALJ gave little weight to Dr. Del Valle's opinions in the two Medical Source Statements, because his opinions were not supported by objective medical evidence and were inconsistent with the credible evidence of Short's activities.  R. 27-28.

The ALJ then found at Step 4 that Short could perform her prior relevant work as a companion.  The ALJ based this finding on:  Gustafson's opinions that Short could perform the companion job if she had the RFC

found by the ALJ; Gustafson's opinion that the companion job was semiskilled; and evidence that Short performed the companion job long enough to become proficient at it.  The DOT Specific Vocational and Preparation Rating (SVP) indicated that the companion job took up to three months to learn, and Short worked the companion job for her mother-in-law for more than three months.  R. 29.  The ALJ concluded that Short was not disabled at Step 4.

Short appealed the ALJ's decision.  On November 5, 2013, the Appeals Council denied Short's request for review.  The decision of the ALJ then became the final decision of the Commissioner.  R. 5.  Short then brought this action for judicial review.

ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation

or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir.

2008).  The ALJ must articulate at least minimally her analysis of all

relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).

The ALJ must "build an accurate and logical bridge from the evidence to his

conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

    In fibromyalgia cases, the ALJ's articulation of her analysis of the

evidence is particularly important.  Fibromyalgia is a "common, but elusive

and mysterious, disease" because "its symptoms are entirely subjective.

There are no laboratory tests for the presence or severity of fibromyalgia."

Sachet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996).  As a result, medical

diagnostic tests and techniques may show normal or near normal functional

capabilities, but the patient may testify that she suffers from extreme levels

of disabling pain.  In such circumstances, the ALJ must evaluate all of other

evidence in the record to determine the disabling effects of the claimant's

pain:

> If objective medical evidence does not substantiate the
> person's statements about the intensity, persistence, and
> functionally limiting effects of symptoms, we consider all of the
> evidence in the case record, including the person's daily
> activities, medications or other treatments the person uses, or
> has used, to alleviate symptoms; the nature and frequency of
> the person's attempts to obtain medical treatment for
> symptoms; and statements by other people about the person's
> symptoms
> .

SSR 12-2p, Evaluation of Fibromyalgia (2012).

In many cases, this process of analysis comes down to deciding, in light of all of the other evidence in the case, whether the medical test results or the claimant's testimony more accurately reflect the claimant's functional limitations. A reviewing court applying the substantial evidence standard often must affirm if the ALJ has sufficiently articulated the basis for her choice of which evidence to believe,

> If the administrative law judge believed the medical reports that found that [the claimant] has enough strength to work and disbelieved [the claimant's] own testimony, this would compel the denial of the application for benefits. We cannot say that this combination of belief and disbelief would be unreasonable . . . [unless] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.

Shachet, 78 F.3d at 307.

In this case, the ALJ built the required accurate and logical bridge between the evidence and the result. The ALJ based her determination of the exertional aspects of Short's RFC on medical evidence and additional evidence in the record. The ALJ relied on Dr. Chapa's two examinations and the opinions of Dr. Bilinsky. The ALJ also relied on the records from Dr. Del Valle's office which showed that Short last complained about back pain on July 28, 2009; complained about generalized pain in August 2009 and was prescribed Cymbalta for the myalgia pain; reported on September

16, 2009 that she was "feeling a lot better," that the Cymbalta "really helped," and was not having much back pain;" and that thereafter the records from Dr. Del Valle's office did not contain complaints about generalized pain.  R. 25-26.  The ALJ also relied on the Function Report and Short's statements to Dr. Trello that she took care of her personal hygiene, cooked, cleaned, washed dishes, and did laundry with her husband's help.  R. 24.  The ALJ discounted claims of more debilitating exertional symptoms because they contradicted what Short stated in her testimony or in the Function Report that "her activities included housecleaning chores such as wash dishes, do laundry, vacuum floor, shop for groceries, take care of pets and babysit grandchildren."  R. 28-29.

The ALJ based her determination of the mental aspects of Short's RFC on Dr. Hudspeth's opinions and Dr. Del Valle's records which showed no complaints about depression or other mental problems after she was prescribed Cymbalta in 2006.  R. 23-24.  The ALJ also relied on Short's testimony and reports in the Function Report that she engaged in a wide range of activities and interacted socially with friends and family.  R. 24. The ALJ also relied upon Short's reports in the Function Report that she got along with authority figures and had good social relationships.  R. 27.

The ALJ gave some consideration to Short's depression listed in the RFC by limiting her to semiskilled work.  The ALJ determined that Short's depression symptoms would interfere with her ability to perform skilled work.  R. 29.

The ALJ concluded at Step 4 that Short could perform her prior work as a companion based on the RFC finding and Gustafson's opinions that the companion job was semiskilled and her opinion that Short could perform such work based on the ALJ's RFC determination.  The ALJ also relied on the fact that the DOT stated that Short had already worked as a companion long enough to learn how to perform the job.  R. 29.  The ALJ again built a logical bridge from the evidence to her conclusion.  The decision is supported by substantial evidence.

In reaching her decision, the ALJ rejected Dr. Trello's opinion that Short was mentally seriously impaired in vocational functioning.  The ALJ rejected this opinion because no medical records supported that conclusion; the conclusion was inconsistent with Short's statements in her Function Report that she could follow instructions, get along with others, and complete tasks; and the conclusion was inconsistent with Short's testimony that she regularly interacted socially with others.  R. 24.  The ALJ can properly discount an examining source opinion if the opinion was

inconsistent with other evidence in the record.  See 20 C.F.R. §

404.1527(c)(3) and (c)(4).

The ALJ gave little or no weight to Dr. Del Valle's opinions.  The ALJ

gave no weight to Dr. Del Valle's October 25, 2010 note because it

contained only a bare conclusion that Short could not hold employment.

The ALJ rejected the opinion because Dr. Del Valle was making a legal

conclusion rather than stating a medical opinion about the functional impact

of Short's impairments.  R. 27.  The ALJ may properly reject such

conclusory statements.  See 20 C.F.R. § 404.1527(d)(1); SSR 96-5p.

The ALJ gave little weight to Dr. Del Valle's Medical Source

Statements because both statements were inconsistent with the records of

his office's care and treatment of Short, were inconsistent with the other

medical evidence in the record, were inconsistent with Short's Function

report, and were inconsistent with Short's testimony about her regular

social interactions with friends and family.  The ALJ specifically noted that

Dr. Del Valle incorrectly stated that Short experienced three episodes of

decompensation.  No evidence of decompensation existed in the record.

An ALJ is not required to give controlling weight if those opinions are not

supported by medical evidence in the record, and are not supported by

other evidence in the record.  20 C.F.R. § 404.1527(c)(2); SSR 96-5p.  The

ALJ sufficiently explained her determination that the evidence in the record did not support Dr. Del Valle's opinions.  The ALJ's decision to give those opinions little weight was supported by substantial evidence.  Short's arguments to the contrary are not persuasive.

Short argues that the ALJ erred in crediting medical evidence over Short's subjective complaints of pain due to fibromyalgia.  Short argues that reliance on medical test results is error in fibromyalgia cases because medical tests do not detect fibromyalgia.  The Court disagrees.  In fibromyalgia cases, the ALJ may "believe" the medical evidence and "disbelieve" the claimant's testimony, and this Court must affirm, as long as the ALJ builds "an accurate and logical bridge between the evidence and the result." Sachet, 78 F.3d at 307.  The ALJ built such a bridge in this case.

Short also argues that the ALJ erred in her credibility finding.  The Court disagrees.  After the filing of the parties' briefs in this case, the Social Security Administration substantially changed evaluation of credibility standards.  On March 16, 2016, the Social Security Administration issued Social Security Ruling 16-3p, 2016 WL 1119029 (SSR 13-3p) .  The Rule became effective on that date.  SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of

law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." <u>Lauer v. Apfel</u>, 169 F.3d 489, 492 (7th Cir. 1999) (internal citations omitted) (citing 20 C.F.R. § 402.35(b)(1)).  Courts "generally defer to an agency's interpretations of the legal regime it is charged with administrating." <u>Liskowitz v. Astrue</u>, 559 F.3d 736, 744 (7th Cir. 2009).

SSR 16-3p addressed the method by which adjudicators, such as an Administrative Law Judge (ALJ), should "evaluate statements regarding the intensity, persistence, and limiting effects of symptoms in disability claims under Titles II and XVI."  SSR 16-3p eliminates "the use of the 'term' credibility'" from the evaluation process.  The Social Security Administration stated in SSR 16-3p, "[W]e clarify that subjective symptom evaluation is not an examination of an individual character.  Instead, we will more closely follow our regulatory language regarding symptom evaluation."  The new ruling supersedes SSR 96-7p, 1996 WL 374186 (July 2, 1996).  SSR 16-3p, 2016 WL 1119029, at *1.

The Administration summarized the method of evaluation to be used by ALJs and other adjudicators (hereinafter ALJ):[7]

---

[7] The Court uses the tem ALJ because the ALJ's decision in this case is the relevant adjudication at issue.  SSR 13-3p gives guidance to all adjudicators in the Administrations evaluative process.

> Consistent with our regulations, we instruct our adjudicators to consider all of the evidence in an individual's record when they evaluate the intensity and persistence of symptoms after they find that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms. We evaluate the intensity and persistence of an individual's symptoms so we can determine how symptoms limit ability to perform work-related activities for an adult and how symptoms limit ability to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim.

Id., at *2.  The ALJ will continue to use a two-step evaluation of an individual's symptoms.  The ALJ first must determine whether a claimant has a medically determinable impairment that could reasonably be expected to produce an individual's symptoms.  The ALJ does not consider statements about the severity of symptoms at this first step.  The first step in the two-step evaluation as set forth in SSR 16-3p is consistent with the Administration's prior superseded ruling.  See SSR 96-7p, 1996 WL 374186 (July 2, 1996), at *2.

If a claimant has such a medically determinable impairment, the ALJ moves to the second step.  At the second step, the ALJ must consider all of the evidence in the record to determine the intensity, persistence, and limiting effect of the claimant's symptoms:

> In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects

of symptoms; statements and other information provided by
medical sources and other persons; and any other relevant
evidence in the individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4.  The Administration further stated:

. . . We will not evaluate an individual's symptoms based solely
on objective medical evidence unless that objective medical
evidence supports a finding that the individual is disabled.  We
will evaluate an individual's symptoms based on the evidence in
an individual's record as described below; however, not all of
the types of evidence described below will be available or
relevant in every case.

Id.

The Administration instructed the ALJ to evaluate whether statements

about symptoms "are consistent with the objective medical evidence or

other evidence in the record."  The Administration explained:

We may or may not find an individual's symptoms and related
limitations consistent with the evidence in his or her record. We
will explain which of an individual's symptoms we found
consistent or inconsistent with the evidence in his or her record
and how our evaluation of the individual's symptoms led to our
conclusions. We will evaluate an individual's symptoms
considering all the evidence in his or her record.

Id., at 8.  The Administration instructed the ALJ to thoroughly explain the

evaluation of evidence of the claimant's symptoms:

In evaluating an individual's symptoms, it is not sufficient for our
adjudicators to make a single, conclusory statement that "the
individual's statements about his or her symptoms have been
considered" or that "the statements about the individual's
symptoms are (or are not) supported or consistent." . . . The
determination or decision must contain specific reasons for the

weight given to the individual's symptoms, be consistent with
and supported by the evidence, and be clearly articulated so
the individual and any subsequent reviewer can assess how the
adjudicator evaluated the individual's symptoms.

Id., at 9.

The Administration instructed the ALJ not to use the term "credibility"

in making this evaluation.  Id. at *1.  The prior, superseded ruling, SSR 96-

7p, stated that, "the adjudicator <u>must make a finding on the credibility of the

individual's statements</u> based on a consideration of the entire case record."

SSR 96-7p, 1996 WL 374186, at *2 (emphasis added).

The Administration explained that SSR 16-3p removed the term

"credibility" because the ALJ is not to determine the truthfulness of the

person making a statement, only the statement's evidentiary value in light

of the other evidence in the record:

Adjudicators must limit their evaluation to the individual's
statements about his or her symptoms and the evidence in the
record that is relevant to the individual's impairments. <u>In
evaluating an individual's symptoms, our adjudicators will not
assess an individual's overall character or truthfulness in the
manner typically used during an adversarial court litigation. The
focus of the evaluation of an individual's symptoms should not
be to determine whether he or she is a truthful person.</u> Rather,
our adjudicators will focus on whether the evidence establishes
a medically determinable impairment that could reasonably be
expected to produce the individual's symptoms and given the
adjudicator's evaluation of the individual's symptoms, whether
the intensity and persistence of the symptoms limit the
individual's ability to perform work-related activities . . . .

SSR 16-3p, 2016 WL 1119029, at *10 (emphasis added).

In this case, the ALJ made her decision on June 16, 2012, before the effective date of SSR 16-3p.  R. 30. The ALJ's decision became the final decision of the Commissioner on November 5, 2013, when the Appeals Counsel denied Short's request for review.  The initial question is whether SSR 16-3p applies retroactively to final decisions made before the March 16, 2016, effective date of SSR 16-3p.

A new statement by an administrative agency generally applies retroactively to administrative decisions that are subject to judicial review on the effective date of the statement if the statement only clarifies an existing ruling.  A new statement generally does not apply retroactively if the new statement makes a substantive change in the law.  Pope v. Shalala, 998 F.2d 473, 482-83 (7th Cir. 1993) overruled on other grounds, Johnson v. Apfel, 189 F.3d 561, 562-63 (7th Cir. 1999).  Courts give great weight to an agency's intent and interpretation of the ruling, but the agency's interpretation is not dispositive.  The agency cannot make a substantive change and call it a clarification.  Id., at 483.

The Administration stated that SSR 16-3p was a clarification.   SSR 16-3p, 2016 WL 1119029, at *1. The Court agrees with the Administration's characterization.

SSR 16-3p keeps the existing two-step evaluation of symptoms. SSR 16-3p, further, keeps the basic method of evaluation at the second step.  The ALJ must evaluate statements about a claimant's symptoms based on all the relevant evidence in the record.  SSR 96-7p, similarly, directed the ALJ to make a finding of the credibility of statements about symptoms based on all the entire record.  SSR16-3p stated that the term "credibility" should not be used, but the ALJ still must evaluate whether statements regarding symptoms are consistent with all the other relevant evidence, including objective medical evidence.  The Administration only clarified that evaluating statements regarding symptoms did not involve assessing the truthfulness of the speaker; rather, the ALJ must evaluate such statements along with all of the other evidence in the record to determine "whether the intensity and persistence of the symptoms limit the claimant's ability to perform work-related activities."  Id., at 10.  SSR16-3p does not make a substantive change in the two-step analysis of evidence of symptoms.

Pursuant to the Seventh Circuit's guidance in Pope v. Shalala, SSR 16-3p applies retroactively to the ALJ's decision in this case.  At least five other courts in this Circuit have also concluded that SSR 16-3p applies retroactively.  McCammond v. Colvin, 2016 WL 3595736, at *2-4 (N.D. Ill.

July 5, 2016); <u>Farrar v. Colvin</u>, 2016 WL 3538827, at *5 (N.D. Ill. June 29, 2016); <u>Lockwood v. Colvin</u>, 2016 WL 2622325, at *3 n.1 (N.D. Ill. May 9, 2016); <u>Hapberg v. Colvin</u>, 2016 WL 1660493, at *6 (N.D. Ill. April 27, 2016); <u>Pietruszynski v. Colvin</u>, 2016 WL 1535158, at *6 n.6 (N.D. Ill. April 14, 2016).

As noted above, SSR 16-3p cautions that adjudicators not assess an individual's overall character or truthfulness and should not focus on the evaluation of an individual's symptoms by making a determination whether or not he or she is a truthful person.  Adjudicators, in this case the ALJ, must focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and, given the adjudicator's evaluation of the symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work related activities.

Even though SSR 16-3p was not in effect at the time of the ALJ's decision in this case, the ALJ followed the methodology established under the new ruling.  In her decision, the ALJ did not evaluate the claimant's statements regarding her symptoms based upon determination of whether or not the Plaintiff was a truthful person.   Instead, the ALJ evaluated the claimant's statements regarding her symptoms and whether the intensity

and persistence of those symptoms limited her work activities by evaluating

both the objective medical evidence, the claimant's statements about

intensity, and information provided by medical sources and other opinions

and other relevant evidence in the record.  The ALJ in this case evaluated

the claimant's statements about her symptoms by referring to "the objective

medical and other evidence in the record".  R. 29.  Since the ALJ followed

the methodologies suggested by SSR 16-3p, it is unnecessary to remand

this proceeding to conform the ALJ's decision to the requirements of the

new ruling.

Short's testimony about the debilitating nature of her condition directly

contradicted her own Function Report.  Short testified that she did not cook,

did not clean, did not do laundry, and only rarely went grocery shopping

with her husband.  She reported that when she went shopping she stayed

in the store for only fifteen minutes.  R. 58, 63-64.  Short stated in the

Function Report, however, that she cooked daily, did dishes, cleaned

house, did laundry and regularly went grocery shopping for an hour at a

time.  R. 234-38.  The contradictions provided an ample basis to find those

portions of Short's testimony to be inconsistent.

Short argues that the differences between the November 2010

Function Report and her May 2012 testimony reflected a deterioration of

her condition.  The Court again disagrees.  The medical records did not show a significant worsening of her condition over this time period, and Short testified twice at the hearing that her functional limitations due to her condition had not changed for two years.  R. 51, 58.  Short completed the Function Report only eighteen months before the hearing. The ALJ could properly conclude that the contradictions between the Function Report and Short's testimony did not  reflect changes in Short's condition, but rather, were inconsistencies to be weighed in evaluating her limitations.

The ALJ also discounted Short's husband's Third-Party Report because it contradicted Short's Function Report and because his statements were not consistent with the medical evidence.   The ALJ could reasonably decide to credit Short's own assessment of her functional abilities over her husband's assessment, particularly when the medical evidence in the record was consistent with Short's assessment.  There was no error.

Short also argues that the ALJ did not adequately explain the basis for her finding that Short could perform semiskilled work.  Short argues that the ALJ failed to explain how this finding was consistent with Dr. Hudspeth's opinion that Short had moderate difficulties in maintaining

concentration, persistence or pace; and with Short's statement in her Function Report that she did not handle stress or changes in routine well.

The Court disagrees.  A finding of a moderate limitation "does not prevent an individual from functioning 'satisfactorily.'"  Roberson v. Astrue, 481 F.3d 1020, 1024 (7th Cir. 2007) (citing Lacroix v. Barnhart, 465 F.3d 881, 888 (8th Cir. 2006.  Under the regulations, semiskilled work "needs some skills but does not require doing the more complex work duties." 20 C.F.R. § 404.1568(b).  The ALJ sufficiently explained that medical evidence showed that Short's depression was well controlled with medication.  R. 23.  The ALJ, however, concluded that Short's symptoms would still restrict her abilities to perform complex tasks required by skilled work.  R. 29.  The ALJ's finding of a limitation to semiskilled work is supported by substantial evidence, and the Court can track the ALJ's analysis on this point.  See Green v. Shalala, 51 F.3d 96, 101 (7th Cir. 1995).

Short also cites cases in which restrictions in RFCs limiting claimants to "unskilled, simple tasks" failed to account for difficulties in memory, concentration, and mood swings.  Plaintiff's Memorandum in Support of Summary Judgment (de 21), at 14 (citing Yurt v. Colvin, 758 F.3d 850, 858-59 (7th Cir. 2014); Stewart v. Astrue, 561 F.3d 679, 684 (7th Cir. 2009); Craft

v. Astrue, 539 F.3d 668, 677 (7th Cir. 2008).  The ALJ did not make such a simplistic analysis in this case.  She determined that depression symptoms and ruminations would interfere with Short's ability to concentrate and perform complex tasks.  The regulations defined semiskilled work as work that required some skill but did not involve more complex duties.  20 C.F.R. § 404.1568(b).  The ALJ, therefore, tied her RFC limitation to semiskilled work directly to the effect of Short's depression on the factors in the regulations that defined semiskilled work.  The criticisms in Yurt, Stewart and Craft do not apply here.

THEREFORE, THIS COURT RECOMMENDS that Plaintiff Jill Short' corrected Motion for Summary Judgment (d/e 20) should be DENIED, Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 24) should be ALLOWED, and the decision of the Commissioner should be AFFIRMED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video

<u>Views, Inc. v. Studio 21, Ltd.</u>, 797 F.2d 538, 539 (7th Cir. 1986).  <u>See</u> <u>Local</u>

<u>Rule</u> 72.2.

ENTER:  July 19, 2016

*s/ Tom Schanzle-Haskins*

UNITED STATES MAGISTRATE JUDGE